## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAUREN MARSH                                         *
8715 Hayshed Lane, Suite 22                          *
Columbia, Maryland 21045                             *
                                                     *
      PLAINTIFF  ,                                 *
                                                     *
        v.                                       *       CASE NO.:
                                                     *
MONTANA APOTHECARY, LLC                              *
d/b/a ALTSOL CRAFT CANNABIS                          *
2170 24th Place, NE                                  *
Washington, DC 20018                                 *
                                                     *
SERVE:     D.C. Registered Agent, Inc.               *
           2300 N Street, NW, Suite 300-RLK          *
           Washington, DC 20037                      *
                                                     *
      DEFENDANT.                                    *

*************************************************************************

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

      Lauren Marsh ("Plaintiff"), through counsel, files her Complaint and Demand for Trial by Jury the Montana Apothecary, LLC d/b/a AltSol Craft Cannabis ("Defendant"), and in support alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

      1.    Plaintiff is a thirty-six (36) year-old adult female domiciliary of Howard County, Maryland.

      2.    During the period of about August 15, 2022, through September 8, 2023 ("the relevant period"), Defendant employed Plaintiff as a Production Technician to perform employment duties at its medical cannabis manufacturing

and packaging facility located at 2170 24th Place, NE, Washington, DC 20018.

3.      Defendant is a Limited Liability Company, formed under the laws of Montana.

4.      Defendant is a citizen of Florida, the state of citizenship of Defendant's owners and members.

5.      During the relevant period, Defendant operated a medical cannabis manufacturing and packaging facility located at 2170 24th Place, NE, Washington, DC 20018.

6.      Most acts and omissions giving rise to this action occurred within the District of Columbia.

7.      In this action, Plaintiff seeks recovery of damages against Defendant in an amount ***exceeding*** Seventy-Five Thousand Dollars and Zero Cents ($75,000.00).

8.      Pursuant to 28 U.S.C. § 1332(a)(1), the United States District Court properly confers Diversity Jurisdiction over the Parties and Plaintiff's causes of action because (a) Plaintiff seeks recovery of damages in this action against Defendant ***exceeding*** Seventy-Five Thousand Dollars and Zero Cents ($75,000.00), and complete diversity of citizenship exists between the Parties.

9.      In this action, Plaintiff seeks damages against Defendant for sex-based (female) discrimination, sex-based (female) hostile work environment, and for sexual harassment in violation of Plaintiff's rights under the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 *et seq.*

2

10.     In this action, Plaintiff seeks damages against Defendant for violations of Plaintiff's wage payment rights under the District of Columbia Minimum Wage Act ("DCMWA"), D.C. Code §§ 32-1001 *et seq*., and the District of Columbia Wage Payment and Collection Law ("DCWPCL"), D.C. Code §§ 32-1301 *et seq*.

11.     During the period of at least March 12, 2023, through March 17, 2023, Defendant owned and/or controlled a temporary leasehold over a residential property located at 121 Orr Street, Buckhannon, West Virginia 26201 ("the West Virginia House").

12.     During the period of about March 13, 2023, through about March 17, 2023, Defendant directed Plaintiff to temporarily cohabitate and reside within the West Virginia House with Plaintiff's manager and Defendant's manager and agent Rodrigo Alarcon ("Alarcon") while performing employment duties for Defendant's benefit within West Virginia.

13.     On March 13, 2023, March 15, 2023, and March 16, 2023, Plaintiff's manager and Defendant's manager and agent Alarcon sexually assaulted Plaintiff within the West Virginia House.

14.     In this action, Plaintiff seeks damages against Defendant under West Virginia law arising from its negligence in permitting, facilitating, or failing to take reasonable and necessary steps to stop or prevent Alarcon's sexual assaults against Plaintiff within the West Virginia House on March 13, 2023, March 15, 2023, and March 16, 2023.

15.    Pursuant to the foregoing, venue and jurisdiction over the Parties and Plaintiff's claims at bar are proper in the United States District Court for the District of Columbia.

## FACTS

16.    Plaintiff commenced her employment with Defendant as a Production Technician on August 15, 2022.

17.    During the period of Plaintiff's employment, Plaintiff primarily performed employment duties for Defendant's benefit within Defendant's medical cannabis manufacturing and packaging facility, located at 2170 24th Place, NE, Washington, DC 20018.

18.    While employed, Plaintiff's primary job duties included (a) collecting and removing dried medical-grade cannabis flower from stalks; (b) hand-trimming and preparing dried cannabis flower for sale and distribution to medical dispensaries within the District of Columbia; (c) weighing and pre-packaging dried cannabis flower for sale and distribution to medical dispensaries within the District of Columbia; (d) cleaning and maintaining Defendant's lab, dry room, grow rooms, and common areas; (e) receiving, unloading, and performing quality checks on deliveries of glass jars; and (f) and performing other labor tasks as assigned by Defendant's management.

19.    At all times during Plaintiff's period of employment, Defendant had actual knowledge of the District of Columbia overtime compensation mandate requiring its payment of time-and-one-half overtime premium wages to all non-exempt

4

employees for overtime work exceeding forty (40) hours per week.

20.     At no time during Plaintiff's period of employment did Plaintiff perform job duties making her exempt from the District of Columbia overtime compensation mandate requiring Defendant to pay Plaintiff time-and-one-half overtime premium wages for all overtime Plaintiff worked exceeding forty (40) hours per week.

21.     At all times during Plaintiff's employment, Defendant knew or reasonably should have known that Plaintiff did not perform job duties making her exempt from the District of Columbia overtime compensation mandate requiring Defendant to pay Plaintiff time-and-one-half overtime premium wages for all overtime Plaintiff worked exceeding forty (40) hours per week.

22.     While employed, the exact number of hours Plaintiff worked varied slightly from week to week.

23.     While employed, Plaintiff typically and customarily worked between Forty-Five (45) to Fifty-Five (55) hours per week.

24.     While employed, Defendant had actual knowledge, through in-person supervision and video and electronic monitoring, of all hours Plaintiff worked each week, including overtime Plaintiff worked exceeding forty (40) hours per week.

25.     Defendant paid Plaintiff hourly for her work during the first 90 days of her employment at a rate of $18 per hour but did not pay Plaintiff overtime for any of the hours she worked over 40 during that time period.

26.     After Plaintiff's first 90 days, Defendant paid Plaintiff a salary of

5

approximately $45,000 annually.

27.     Starting on January 1, 2023, of Plaintiff's employment, Defendant paid Plaintiff as a salaried employee at a rate of about Fifty Thousand Dollars ($50,000.00) annually.

28.     During Plaintiff's employment, Defendant and Plaintiff did not discuss or agree upon a regular hourly rate Defendant would pay Plaintiff for weekly non-overtime hours (40 hours or less).

29.     At no time during Plaintiff's employment did Defendant and Plaintiff discuss or agree upon an overtime premium rate Defendant would pay Plaintiff for weekly overtime exceeding Forty (40) hours per week.

30.     At no time during Plaintiff's employment did Defendant pay Plaintiff any wages for overtime Plaintiff worked for Defendant's benefit exceeding Forty (40) hours per week.

31.     Throughout Plaintiff's entire employment, Defendant unlawfully withheld and failed to pay Plaintiff earned wages at the overtime premium rate of one-and-one-half times Plaintiff's regular hourly rate for all overtime Plaintiff worked for Defendant's benefit exceeding Forty (40) hours per week.

32.     Defendant's unlawful withholding of Plaintiff's earned overtime wages was with actual knowledge of illegality and was not the product of good faith mistake or oversight.

33.     March 12, 2023, Defendant directed Plaintiff to travel for employment-

related purposes for the week to Buckhannon, West Virginia, to train staff at Defendant's sister company, Armory Pharmaceutical ("Armory").

34.    While on the work-trip, Defendant directed Plaintiff to reside and sleep within the West Virginia House, approximately one (1) street away from Armory.

35.    On or about March 12, 2023, Defendant's Director of Operations Michael Piesto ("Piesto"), on behalf of Defendant, texted Plaintiff, therein advising Plaintiff that Alarcon, and another male co-worker named Julian, would be joining Plaintiff the following day in West Virginia, and that Defendant had arranged for Alarcon and Julian to reside and sleep within the West Virginia House, along with Plaintiff.

36.    Throughout Plaintiff's employment, Alarcon, while carrying out his employment duties as Defendant's Post-Production Manager, was one of Plaintiff's workplace superiors and managers, holding power and authority in the workplace over Plaintiff that included, but was not limited to, (a) authority to subject Plaintiff to employment related discipline up to and including termination; (b) authority to set, alter, or modify Plaintiff's work schedule; and (c) authority to assign, alter, or modify Plaintiff's work duties or responsibilities.

37.    On March 13, 2023, Alarcon and Julian arrived at the West Virginia House in the early evening.  After arriving, Alarcon and Julian left the West Virginia House and, thereafter, returned to the West Virginia house with food, beer, tequila, and a television.

7

38.    On information and belief, Alarcon and Julian purchased alcoholic beverages using Defendant's company credit card.

39.    Thereafter, Plaintiff, Alarcon, and Julian sat together in a common area within the West Virginia House to socialize, watch television, and drink alcoholic beverages.

40.    On information and belief, Defendant had actual knowledge that Alarcon, Julian, and Plaintiff were drinking alcoholic beverages within the West Virginia House and authorized the same without restriction, safety protocols, or direction regarding moderation.

41.    Thereafter, as evening set in, Julian went to the bedroom he had claimed for the week within the West Virginia House.

42.    Alarcon moved closer to the Plaintiff shortly after Julian's departure and asked if he could touch her hand. The Plaintiff perceived Alarcon's actions as having a sexual intent. She quickly left the room and went to the bedroom she had claimed for the week within the West Virginia House.

43.    Alarcon, nearly immediately thereafter, followed Plaintiff, uninvited, into Plaintiff's bedroom within the West Virginia House despite knowing that she had consumed alcohol in his presence and had left the room to distance herself from his sexual advances.

44.    Upon entering Plaintiff's bedroom, Alarcon closed Plaintiff's bedroom door and immediately began groping Plaintiff and taking off Plaintiff's clothes.

45.    Plaintiff immediately physically pushed Alarcon away and told Alarcon oppositional words such as, but not limited to, "No" and "Stop."

46.    Alarcon did not stop, and, over Plaintiff's verbal protestations, sexually assaulted Plaintiff by using his body weight and strength to hold Plaintiff down on Plaintiff's bed and penetrating Plaintiff's vagina repeatedly with his penis.

47.    In addition to Plaintiff's direct protests, Alarcon knew or should have known that Plaintiff was unable to consent to sexual activity based on her consumption of alcohol.

48.    After Alarcon finished vaginally penetrating Plaintiff, Alarcon ejaculated on Plaintiff's body, and directed Plaintiff to shower. Alarcon followed her to the shower and made sure she washed off the physical evidence of his assaults.

49.    The following day, March 14, 2023, after performing employment duties at Armory for the day, Plaintiff returned to the West Virginia House.

50.    Immediately upon returning to the West Virginia House, Plaintiff rushed to her bedroom and locked the door. That evening, Alarcon came to Plaintiff's door. He knocked and tried the door handle multiple times but was unable to enter Plaintiff's bedroom. Alarcon knew that Plaintiff was in her room but continued to attempt to enter her room uninvited although Plaintiff clearly did not want to interact with him.

51.    The following day, March 15, 2023, after performing employment duties at Armory for the day, Plaintiff returned to the West Virginia House. That evening, Alarcon was able to enter Plaintiff's bedroom successfully and, over Plaintiff's verbal

protestations, sexually assaulted Plaintiff by using his body weight and strength to hold Plaintiff down on Plaintiff's bed and penetrating Plaintiff's vagina repeatedly with his penis.

52.     The following day, March 16, 2023, after performing employment duties at Armory for the day, Plaintiff returned to the West Virginia House.

53.     That evening, Alarcon was once again able to successfully enter Plaintiff's bedroom and, once again, over Plaintiff's verbal protestations, sexually assaulted Plaintiff by using his body weight and strength to hold Plaintiff down on Plaintiff's bed and penetrating Plaintiff's vagina repeatedly with his penis.

54.     On March 17, 2023, Plaintiff returned home to Maryland.

55.     During the remainder of March 2023, and continuing through the conclusion of Plaintiff's employment, Alarcon engaged in overt and often crude and explicit efforts to pursue Plaintiff sexually.

56.     On about two (2) occasions later in March 2023 and into April 2023, in fear that her rejection of Alarcon's sexual pursuit could create a risk of termination of her employment with Defendant, Plaintiff, against her will, met with Alarcon at his demand to engage in unwanted and constructively forced sex acts.

57.     Thereafter, on multiple ongoing and continuous occasions during the period March 2023, through the conclusion of Plaintiff's employment, Alarcon touched and attempted to sexually touch Plaintiff within the workplace, made sexual and lewd comments and gestures to Plaintiff within the workplace, called Plaintiff's phone after

work hours from restricted and/or private phone numbers, and sent Plaintiff lewd and pornographic videos of himself masturbating through WhatsApp and/or similar mediums.

58.     Defendant did not have a sexual harassment policy, leaving the Plaintiff without any effective means of complaining about Alarcon's behavior.

59.     In addition, Defendant's culture was hostile towards women. For example, Plaintiff heard management comment that they did not want to hire women "because they cause drama."

60.     Prior to and during the period relevant to this action, Alarcon was trained, managed, supervised, and employed by Defendant and performed his duties as Defendant's Post-Production Manager, specifically including within the West Virginia House, under Defendant's direct supervision, employment, agency, and control.

61.     At all times relevant to this action, and specifically including within Defendant's West Virginia House, Alarcon acted on behalf of Defendant as its agent and within the scope of his employment with Defendant.

62.     Defendant is vicariously liable for Alarcon's tortious and unlawful actions against Plaintiff as herein alleged and specifically including Alarcon's sexual assaults against Plaintiff occurring on March 13, 2023, March 15, 2023, and March 16, 2023, within the West Virginia House.

63.     In or about April 2023, one of Plaintiff's managers, a Team Lead named

11

Madilyn "Madi" Tall ("Tall"), accused Plaintiff of romantically pursuing Tall's boyfriend, which Plaintiff expressly and truthfully denied.

64.     Thereafter, Tall became very cold towards Plaintiff, and began ordering Plaintiff to perform undesirable "grunt work" within Plaintiff's division and undesirable "grunt work" to help Defendant's Grow Team.

65.     From April 2023 until the end of Plaintiff's employment, Tall engaged in hostile and discriminatory actions based on sex or gender, driven by her belief that Plaintiff was romantically interested in her boyfriend. Tall made accusations of workplace misconduct against Plaintiff and took other related actions, aiming to influence Defendant's management to terminate Plaintiff's employment.

66.     On September 8, 2023, Piesto, on behalf of Defendant, notified Plaintiff that Defendant had decided to terminate Plaintiff's employment.

67.     The cause or basis Piesto, on behalf of Defendant, provided to Plaintiff for her termination was a lack of work.

68.     The cause or basis Piesto, on behalf of Defendant, provided to Plaintiff for her termination was false, pretextual, and fabricated.

69.     This reason was pretextual, and the true and motivating cause for Defendant's decision to terminate Plaintiff's employment was Defendant succumbing to Tall's scheme to cause or facilitate the same, arising from Tall's gender-biased discriminatory belief that Plaintiff, a female, was romantically pursuing Tall's boyfriend.

70. Defendant's termination of Plaintiff's employment was perpetrated and facilitated by and through Tall while Tall was working as an agent of, on behalf of, and within the scope of her employment for Defendant.

71. Defendant is liable for its unlawful sex-biased termination of Plaintiff's employment because Tall's actions and motivations are imputed to Defendant and because Defendant engaged in, authorized, and ratified Tall's unlawful sex-biased hostile and discriminatory conduct against Plaintiff.

72. Defendant's ongoing and continuous sex-based discriminatory, hostile, and tortious treatment of Plaintiff during the period March 2023 through September 8, 2023, including Alarcon's sexual assaults against Plaintiff, Alarcon's sexual harassment of Plaintiff, and Tall's discriminatory treatment of Plaintiff, causing or resulting in Defendant's unlawful termination of Plaintiff's employment, directly and proximately caused Plaintiff to suffer substantial resulting emotional damages, including past and ongoing public embarrassment and ridicule, past and ongoing anxiety, past and recurring panic attacks, past and recurring sleep interruption, lack of sleep, and nightmares, and general sadness, resulting in Plaintiff self-isolating and withdrawing and declining opportunities to engage in social and previously preferred activities.

73. Defendant's ongoing and continuous sex-based discriminatory, hostile, and tortious treatment of Plaintiff during the period March 2023, through September 8, 2023, including Alarcon's sexual assaults against Plaintiff, Alarcon's sexual harassment of Plaintiff, and Tall's discriminatory treatment of Plaintiff, causing or resulting in

Defendant's unlawful termination of Plaintiff's employment, directly and proximately caused Plaintiff to suffer substantial resulting financial and related economic damages including lost back and future wages, lost back and future employment benefits, and back and future opportunities for promotion, career advancement, and related earnings opportunities, and past and future medical expenses associated with mental health treatment to address past, current, and ongoing resulting emotional damages.

74.     Given the outrageous circumstances of this case, compensatory damages are inadequate to redress the wrongs committed by Defendant and punitive damages are required to appropriately and fairly punish Defendant for its willful, malicious, wanton, and reckless acts against Plaintiff.

## CAUSES OF ACTION

### COUNT I
### DCHRA

75.     Plaintiff incorporates by reference the proceeding paragraphs as if fully alleged in this paragraph.

76.     At all times relevant, Defendant qualified as Plaintiff's "employer" within the meaning of the DCHRA.

77.     At all times relevant, Plaintiff qualified as Defendant's "employee" within the meaning of the DCHRA.

78.     At no time during Plaintiff's employment did Defendant set, establish, implement, or disseminate an anti-discrimination policy proscribing workplace sexual harassment, workplace sex-based discrimination, or creation or carrying out of a sex-

14

based hostile work environment.

79.     At no time during Plaintiff's employment did Defendant set, establish, implement, or disseminate a policy or procedure for employees to notify, report, or complain to Defendant or any agent of Defendant if an employee fell victim to or observed workplace sexual harassment, workplace sex-based discrimination, or creation or carrying out of a sex-based hostile work environment.

80.     At no time during Plaintiff's employment did Defendant train or educate its owners, members, managers, or employees on identifying, reporting, or preventing workplace sexual harassment, workplace sex-based discrimination, or the creation or carrying out of a sex-based hostile work environment.

81.     At no time during Plaintiff's employment did Defendant engage in reasonable efforts to supervise its managers or employees to identify or prevent workplace sexual harassment, workplace sex-based discrimination, or the creation or carrying out of a sex-based hostile work environment.

82.     While Plaintiff was performing employment duties for Defendant's benefit on a work trip in West Virginia, and while residing, as directly assigned by Defendant, within the West Virginia House, on March 13, 2023, March 15, 2023, and March 16, 2023, Alarcon, Plaintiff's manager whom Defendant directed to cohabitate and reside with Plaintiff within the West Virginia House, sexually assaulted Plaintiff.

83.     During the remainder of March 2023, through the conclusion of Plaintiff's employment, Alarcon continued to pursue Plaintiff sexually and over

Plaintiff's protestation of the same.

84.    On about two (2) subsequent occasions during the period March 2023, through about April 2023, in fear that her rejection of Alarcon's sexual pursuit could create a risk of termination of her employment with Defendant, Plaintiff, against her will, met with Alarcon at his demand and engaged with Alarcon in unwanted and constructively forced sex acts.

85.    On multiple, ongoing, and near-daily occasions from about late April 2023, through the end of Plaintiff's employment, Alarcon sexually harassed and caused and created a hostile work environment for Plaintiff on the basis of her sex by touching and attempting to sexually or romantically touch Plaintiff within the workplace, making sexual and lewd comments and gestures to Plaintiff within the workplace, calling Plaintiff's phone from restricted and/or private phone numbers after work hours, and sending Plaintiff crude and pornographic videos of himself masturbating through WhatsApp and/or similar mediums.

86.    Starting in or about April 2023, and continuing and ongoing thereafter until the conclusion of Plaintiff's employment, Tall, one of Plaintiff's direct supervisors, discriminated against Plaintiff because of Plaintiff's sex (female) arising from or related to Tall's false and misconstrued belief that Plaintiff was romantically pursing Tall's boyfriend.

87.    Throughout the period April 2023, through the conclusion of Plaintiff's employment, Tall's discriminatory bias against Plaintiff because of Plaintiff's sex

(female) manifest itself in Tall's creation of a hostile work environment for Plaintiff by becoming very cold towards Plaintiff, and ordering Plaintiff to perform undesirable "grunt work" within Plaintiff's division and assigning Plaintiff to perform undesirable "grunt work" to help the Grow Team.

88.     Throughout the period April 2023, through the conclusion of Plaintiff's employment, Tall's discriminatory bias against Plaintiff because of Plaintiff's sex (female) caused Tall to falsely accuse Plaintiff of malfeasance in the workplace and to undertake strategic efforts to pressure or persuade Defendant's management to facilitate the termination of Plaintiff's employment, which it ultimately did on September 8, 2023.

89.     Defendant's termination of Plaintiff's employment was perpetrated and facilitated by and through Tall while Tall was working as an agent of, on behalf of, and within the scope of her employment for Defendant.

90.     Defendant is liable for its unlawful sex-biased and discriminatory termination of Plaintiff's employment because Tall's sex (gender) based discriminatory motivations are imputed to Defendant, and because Defendant engaged in, authorized, and ratified Tall's unlawful sex (female) biased and discriminatory conduct against Plaintiff.

91.     Defendant engaged in unlawful employment practices by allowing its managers and supervisors Alarcon and Tall to subject Plaintiff to sexual harassment that altered the terms and conditions of Plaintiff's employment and created a hostile

work environment.

92.     Defendant's ongoing and continuous unlawful sex-based discriminatory and hostile treatment of Plaintiff during the period March 2023, through September 8, 2023, including Alarcon's sexual assaults against Plaintiff in March 2023, Alarcon's ongoing sexual harassment of Plaintiff during the  period March 20223, through September 8, 2023, and Tall's sex-biased discriminatory and hostile treatment of Plaintiff commencing in or about April 2023, and continuing until and causing or resulting in Defendant's termination of Plaintiff's employment on September 8, 2023, has directly and proximately deprived Plaintiff of employment opportunities and has otherwise adversely affected Plaintiff's status as an employee because of her female sex.

93.     Defendant's ongoing and continuous unlawful sex-based discriminatory and hostile treatment of Plaintiff during the period March 2023, through September 8, 2023, including Alarcon's sexual assaults against Plaintiff in March 2023, Alarcon's ongoing sexual harassment of Plaintiff during the  period March 20223, through September 8, 2023, and Tall's sex-biased discriminatory and hostile treatment of Plaintiff commencing in or about April 2023, and continuing until and causing or resulting in Defendant's termination of Plaintiff's employment on September 8, 2023, were willful, wanton, malicious and oppressive and were done with reckless indifference to Plaintiff's protected rights under the DCHRA.

94.     Defendant's ongoing and continuous unlawful sex-based discriminatory

and hostile treatment of Plaintiff during the period March 2023, through September 8, 2023, including Alarcon's sexual assaults against Plaintiff in March 2023, Alarcon's ongoing sexual harassment of Plaintiff during the  period March 20223, through September 8, 2023, and Tall's sex-biased discriminatory and hostile treatment of Plaintiff commencing in or about April 2023, and continuing until and causing or resulting in Defendant's termination of Plaintiff's employment on September 8, 2023, directly and proximately caused Plaintiff to suffer substantial resulting emotional damages, including past and ongoing public embarrassment and ridicule, past and ongoing anxiety, past and recurring panic attacks, past and recurring sleep interruption, lack of sleep, and nightmares, and general sadness, resulting in Plaintiff self-isolating and withdrawing and declining opportunities to engage in social and previously preferred activities.

95.     Defendant's ongoing and continuous unlawful sex-based discriminatory and hostile treatment of Plaintiff during the period March 2023, through September 8, 2023, including Alarcon's sexual assaults against Plaintiff in March 2023, Alarcon's ongoing sexual harassment of Plaintiff during the  period March 20223, through September 8, 2023, and Tall's sex-biased discriminatory and hostile treatment of Plaintiff commencing in or about April 2023, and continuing until and causing or resulting in Defendant's termination of Plaintiff's employment on September 8, 2023, directly and proximately caused Plaintiff to suffer substantial resulting financial and related economic damages including lost back and future wages, lost back and future

employment benefits, and back and future opportunities for promotion, career advancement, and related earnings opportunities, and past and future medical expenses associated with mental health treatment to address past, current, and ongoing resulting emotional damages.

WHEREFORE, Defendant is liable to Plaintiff for a monetary judgment for damages in an amount *exceeding* Seventy-Five Thousand Dollars and Zero Cents ($75,000.00) as determined by a jury, to include back and future pay, benefits, and earning opportunities, past and future medical expenses, compensatory damages for past and future mental and emotional pain and suffering and loss of enjoyment of life, punitive damages, attorney's fees, pre and post-judgment interest, the costs of these proceedings; and further relief this Court or a jury deems appropriate.

## COUNT II
## NEGLIGENCE, NEGLIGENT HIRING, SUPERVISION, TRAINING, NAD RETENTION

96.     Plaintiff incorporates by reference the proceeding paragraphs as if fully alleged in this paragraph.

97.     In furtherance of Plaintiff's performance of employment duties, on March 13, 2023, March 15, 2023, and March 16, 2023, Defendant, while acting in the capacity as Plaintiff's employer, directed Plaintiff to temporarily reside and cohabitate within the West Virginia House with Plaintiff's manager and Defendant's manager and agent, Alarcon.

98.     On March 13, 2023, March 15, 2023, and March 16, 2023, Alarcon was

an actual and/or apparent authorized agent, servant, and employee of Defendant.

99.     At all times during Plaintiff's period of employment, Defendant had a duty under applicable standards of common law to properly investigate, credential, qualify, select, monitor, supervise, and retain only competent employees.

100.    During all relevant times, Defendant had a duty under applicable standards of common law to promulgate proper and effective standards, procedures, protocols, systems and rules to ensure the safety and security of Plaintiffs.

101.    On March 13, 2023, through about March 17, 2023, during the period Defendant directed Plaintiff to temporarily reside within the West Virginia House, Defendant had a duty under applicable standards of common law to promulgate proper and effective standards, procedures, protocols, systems and rules to ensure Plaintiff's safety and security.

102.    On March 13, 2023, through about March 17, 2023, during the period Defendant directed Plaintiff to temporarily reside within the West Virginia House, Defendant knew or should have known that Alarcon was engaging in improper, unlawful, and unprofessional behavior toward Plaintiff, or was foreseeably capable of the same.

103.    On March 13, 2023, through about March 17, 2023, during the period Defendant directed Plaintiff to reside within the West Virginia House temporarily, Defendant breached its common law duties by negligently failing to investigate, credential, qualify, select, monitor, and supervise Alarcon and/or the events within the

21

West Virginia House to inspect, discover, and stop Alarcon from sexually assaulting Plaintiff.

104.   As a direct, proximate, immediate, and foreseeable result of Defendant's conduct, Plaintiff has and/or will suffer permanent economic and non-economic damages including but not limited to great indignity, humiliation, shame, mortification and other injuries to their physical, mental, emotional, and nervous systems; severe mental anguish and psychological distress; the cost past, present and future cost of medical care, including but not limited to therapy and psychological counseling; and lost earnings and diminished earning capacity.

105.   Through the conduct of Defendant and its agents and/or representatives during the period Defendant directed to temporarily reside within the West Virginia House, Defendant acted with reckless disregard for Plaintiff's rights.

106.   Alarcon's sexual assaults against Plaintiff within the West Virginia House on March 13, 2023, March 15, 2023, and March 16, 2023, were each perpetrated by Alarcon and against Plaintiff while Plaintiff was performing her employment duties for the benefit of Defendant, while Alarcon was acting as Plaintiff's manager, while Alarcon was acting as Defendant's agent and manager, and while Alarcon was acting under Defendant's supervision, employ, agency, and control.

107.   Defendant engaged in, authorized, and ratified each Alarcon's sexual assaults against Plaintiff within the West Virginia House on March 13, 2023, March 15, 2023, and March 16, 2023.

108.    Defendant is directly liable under the doctrine of *respondeat superior* for Alarcon's sexual assaults against Plaintiff within the West Virginia House on March 13, 2023, March 15, 2023, and March 16, 2023.

109.    At the time Alarcon perpetrated each sexual assault against Plaintiff within the West Virginia House on March 13, 2023, March 15, 2023, and March 16, 2023, Alarcon was working as an agent of, on behalf of, and within the scope of his employment with Defendant.

110.    Defendant is vicariously liable to Plaintiff for all injury and damages suffered arising from each sexual assault Alarcon perpetrated against Plaintiff within the West Virginia House on March 13, 2023, March 15, 2023, and March 16, 2023, and for its own negligence permitting, facilitating, and failing to take reasonable or necessary actions to stop or prevent the same.

WHEREFORE, Defendant is liable to Plaintiff for a monetary judgment for damages in an amount **exceeding** Seventy-Five Thousand Dollars and Zero Cents ($75,000.00) as determined by a jury, to include economic damages, medical expenses, compensatory damages, mental and emotional damages, punitive damages, the costs of these proceedings, and further relief this Court or a jury deems appropriate.

## COUNT III
### DCMWA

111.    Plaintiff incorporates by reference the proceeding paragraphs as if fully alleged in this paragraph.

112.    At all times relevant, Defendant qualified as Plaintiff's "employer"

23

within the meaning of the DCMWA.

113. At all times relevant, Plaintiff qualified as Defendant's "employee" within the meaning of the DCMWA.

114. Pursuant to the District of Columbia law, Defendant was required to pay Plaintiff overtime premium wages for overtime worked over forty (40) hours per week at the overtime rate of one-and-one-half times Plaintiff's regular rate of pay.

115. As set forth above, during the period of Plaintiff's employment, Defendant failed to pay Plaintiff overtime premium wages at the overtime rate of one-and-one-half times Plaintiff's regular hourly rate for all overtime Plaintiff worked each week over forty (40) hours.

116. At all times during the period of Plaintiff's employment, Defendant had actual knowledge of the District of Columbia law requiring it to pay Plaintiff overtime premium wages at the overtime rate of one-and-one-half times Plaintiff's regular hourly rate for overtime Plaintiff worked over forty (40) hours.

117. Defendant's failure to pay Plaintiff overtime wages for overtime worked over forty (40) hours per week was with actual knowledge of illegality and was not the product of good faith or excusable mistake.

WHEREFORE, Defendant is liable to Plaintiff for earned and unpaid overtime wages in an amount to be determined by a jury, plus three times (3x) times the amount of unpaid overtime wages as mandatory statutory liquidated damages (a total of quadrupled (4x) damages), pre and post-judgment interest, attorney's fees, the costs of

these proceedings, and further relief this Court or a jury deems appropriate.

## COUNT IV
## DCWPCL

118.    Plaintiff incorporates by reference the proceeding paragraphs as if fully alleged in this paragraph.

119.    At all times relevant, Defendant qualified as Plaintiff's "employer" within the meaning of the DCWPCL.

120.    At all times relevant, Plaintiff qualified as Defendant's "employee" within the meaning of the DCWPCL.

121.    Pursuant to the District of Columbia law, Defendant was required to pay Plaintiff full and timely compensation of all earned wages due and owing each pay period.

122.    As set forth above, each pay period throughout Plaintiff's period off employment, Defendant failed to pay, and unlawfully withheld Plaintiff's earned, and District of Columbia law required time-and-one-half overtime wages for all overtime Plaintiff worked over forty (40) hours per week.

123.    Defendant's failure to fully and timely pay Plaintiff earned overtime wages for overtime worked over forty (40) hours per week as required by District of Columbia law was with actual knowledge of illegality and was not the product of good faith or excusable mistake.

WHEREFORE, Defendant is liable to Plaintiff for earned and unpaid wages in an amount to be determined by a jury, plus three times (3x) times the amount of

unpaid wages as mandatory statutory liquidated damages (a total of quadrupled (4x) damages), pre and post-judgment interest, attorney's fees, the costs of these proceedings, and further relief this Court or a jury deems appropriate.

## JURY DEMAND

Plaintiff requests a trial by jury on all facts and issues so triable.

Dated: September 6, 2024         Respectfully submitted,

ZIPIN, AMSTER & GREENBERG, LLC

_/s/  Gregg C. Greenberg_
Gregg C. Greenberg, Bar No. MD17291
Edith K. Thomas, Bar No. 496388
8757 Georgia Avenue, Suite 400
Silver Spring, Maryland 20910
Phone:  301-587-9373
Email: GGreenberg@ZAGFIRM.COM
          EThomas@ZAGFIRM.COM

*Counsel for Plaintiff*